1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**UNITED STATES DISTRICT COURT**
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

NEXTG NETWORKS OF CALIFORNIA, INC., a
Delaware Corporation,

                  Plaintiff,

     v.

THE CITY OF SAN FRANCISCO and THE
DEPARTMENT OF PUBLIC WORKS OF THE CITY
OF SAN FRANCISCO,

                Defendants.

_____/

No. C 05-00658 MHP

**MEMORANDUM & ORDER
Re: Motion for Summary
Adjudication**

       Plaintiff NextG Networks of California, Inc. ("NextG"), a telecommunications company, has filed the present action against the City of San Francisco and the Department of Public Works of the City of San Francisco (collectively, "the City"), alleging that the City has violated NextG's right to install, operate, and maintain its facilities along or upon the public rights-of-way consistent with sections 7901 and 7901.1 of the California Public Utilities Code, section 253 of the Telecommunications Act of 1996, 47 U.S.C. sections 151 et seq, and NextG's due process, equal protection, and just compensation rights under the United States Constitution.  NextG seeks declaratory judgment, injunctive relief, and money damages.  Now before the court is NextG's motion for summary adjudication on certain of its claims.  Having considered the parties' arguments and submissions, the court enters the following memorandum and order.

UNITED STATES DISTRICT COURT
For the Northern District of California

BACKGROUND[1]

Plaintiff NextG is a Delaware corporation with its principal place of business in Milpitas, California.  On January 30, 2003, the California Public Utilities Commission ("CPUC") granted NextG's application for a certificate of public convenience and necessity ("CPCN") to provide telecommunication services in California.  NextG's application sought authority to obtain a limited facilities-based CPCN and described its intention to operate a system of fiber optic cables and small antennas and conversion equipment attached to poles and other structures.  The CPUC's order granting the certificate did not specify the precise extent of NextG's authority, but simply granted a CPCN to operate as a limited, facilities-based and resale provider of local exchange and interexchange services.

NextG's telecommunications services differ in certain respects from services offered by traditional telecommunications providers.  NextG does not operate a complete end-to-end communication network or offer services directly to consumers or businesses.  Rather, NextG's network consists of discrete, localized extensions to other wireless carriers' networks which "transport" the carriers' signals to problematic coverage areas.  Each unit of NextG's network consists of a pair of radio frequency ("RF") transmitter / receivers connected by fiber optic cable.  At one end of the cable, the "hub" receiver picks up a wireless carrier's RF signal, converts it to an optical signal, and transports it across NextG's fiber optic cable to the "remote" transmitter at the other end, which then converts the optical signal to an RF signal and rebroadcasts it to the wireless carrier's subscribers.  RF signals generated by the subscribers follow the same path in reverse, entering NextG's system at the remote receiver, proceeding through NextG's fiber optic cable, and exiting NextG's system as an RF signal broadcast by the hub transmitter.  NextG's network thus comprises two types of physical components:  fiber optic cable, which is deployed through conduits; and the RF transmitter / receiver units ("RF antennas"), which must be located above ground on a structure such as a building or utility pole.

From December, 2002 through July, 2003, NextG submitted inquiries and applications to the City, seeking authority to install its telecommunications network on public rights-of-way in San

2

UNITED STATES DISTRICT COURT
For the Northern District of California

1  Francisco.  NextG requested that the city issue it a utilities conditions permit ("UCP"), which allows

2  telecommunications providers and other utilities to construct facilities in public rights-of-way.  On

3  August 11, 2003, the City Attorney, acting on behalf of the Department of Public Works, denied

4  NextG's UCP application for such a permit or other authorization.  Although the City granted NextG

5  authority to deploy its fiber optic cable in existing conduits, the City Attorney informed NextG that

6  the City and the Department of Public Works required a discretionary major encroachment permit

7  for the installation of NextG's RF antennas, which the City characterized as new "wireless

8  facilities."

9       The City based its argument on NextG's classification as a "limited" facilities-based

10 provider, as opposed to a "full" facilities-based provider.  According to the City, while it routinely

11 issues UCPs to full facilities-based providers, it requires that all limited facilities-based providers

12 obtain major encroachment permits for the construction of any new facilities, including new wireless

13 facilities.  This is so, according to the City, because limited facilities-based providers are not

14 authorized by the CPUC to construct new wireless facilities such as NextG's RF antennas.

15      NextG then brought the present action against the City of San Francisco and the Department

16 of Public Works, alleging that pursuant to authority vested by the CPUC, it is entitled to install its

17 fiber-optic cable and RF antennas in the public rights-of-way without obtaining a discretionary

18 major encroachment permit.  It alleges that the City's requirement for such a permit violates the

19 Telecommunications Act of 1996, section 7901 of the California Public Utilities Code, and NextG's

20 federal constitutional rights pursuant to 42 U.S.C. section 1983.  In addition to money damages,

21 NextG seeks a declaration of its rights to install, operate, and maintain its telecommunications

22 network in public rights-of-way within the city as well as an order compelling the city to issue any

23 necessary and legitimate permits for such actions forthwith.

24      Following the filing of the present complaint, the City turned the tables, filing its own

25 complaint against NextG with the CPUC to request that the CPUC remove NextG's CPCN or to find

26 that NextG lacks the authority to provide telecommunications services by installing its RF antennas

27 on existing utility poles. See Declaration of Williams K. Sanders in Support of Defendants' Motion

28

3

to Dismiss, Exh. A.  The complaint alleged that rather than provide "competitive local exchange and interexchange telecommunications services," as the company was authorized to do, NextG offers "what it calls radiofrequency transport services to commercial radio mobile service providers."  Id. at ¶¶ 6–7.   Seeking revocation of NextG's licence and declaratory relief, the city alleged that NextG had violated the orders and rules of the CPUC and the terms and conditions of NextG's CPCN by failing to timely provide exchange and interexchange services, representing to the city that it had been authorized to provide radio frequency services, and pursuing the installation of facilities in the public rights-of-way and on existing utility poles.  Id. at ¶¶ 4, 6, 28–44.  At the City's request, this court stayed NextG's federal lawsuit pending the outcome of the City's complaint against NextG before the CPUC.

On January 16, 2006 the CPUC issued an opinion denying in all respects the City's claims for relief.  City & County of San Francisco v. NextG Networks of California, Inc., Decision 06-01-006, 2006 Cal. PUC LEXIS 19 (Cal. Pub. Utils. Comm'n Jan. 12, 2006).  The CPUC resolved four issues disputed by the parties:

> 1. Whether the Commission granted NextG the authority to place antennas and microcells on utility poles and in public rights-of-way in D.03-01-061.
> 2. Whether NextG misrepresented the authority granted it by the Commission in requesting to place microcells and antennas on utility poles in San Francisco and other localities.
> 3. Whether NextG timely exercised its authority.
> 4. Whether the placement of microcells and antennas on utility poles by a telephone corporation such as NextG is exempt from the California Environmental Quality Act (CEQA).

Id. at *5.

With respect to the first and fourth issues, the CPUC noted that it has construed limited facilities-based CPCNs to include wholesale services, such as NextG's service, as well as traditional retail services that are offered direct to consumers.  Id. at *8.  The CPUC further noted that it has not distinguished between wireline and wireless carriers.  Id. at *8–*9.  Thus, the CPUC concluded that "our decision grants the authority requested and authorizes NextG to provide radiofrequency transport services."  Id. at *11.  The CPUC also found that "[a]llowing placement of microcells and antennas on existing utility poles is consistent with limited facilities-based authority, because no

4

construction is involved.  It is also consistent with our prior decision that installation of fiber optic equipment on existing utility structures is categorically exempt from CEQA."  Id. at *12–*13.  As a result, the CPUC found that NextG is authorized to install its RF antennas on existing utility poles. Id. at *14.

With respect to the second and third issues, the CPUC found that NextG has accurately represented its authority to the city, and that NextG has timely exercised that authority.  Id. at *17–*18.

The stay in this case was lifted following the CPUC's ruling.  NextG now moves for summary adjudication of its claims that the City's permit requirement is preempted by federal telecommunications law and state law as now clarified by the CPUC.

LEGAL STANDARD

Summary judgment is proper when the pleadings, discovery and affidavits show that there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Material facts are those which may affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party.  Id.  The party moving for summary judgment bears the burden of identifying those portions of the pleadings, discovery, and affidavits that demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Cattrett, 477 U.S. 317, 323 (1986).  On an issue for which the opposing party will have the burden of proof at trial, the moving party need only point out "that there is an absence of evidence to support the nonmoving party's case."  Id.

Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings and, by its own affidavits or discovery, "set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).  Mere allegations or denials do not defeat a moving party's allegations.  Id.; Gasaway v. Northwestern Mut. Life Ins. Co., 26 F.3d 957, 960 (9th Cir. 1994).  The court may not make credibility determinations, and inferences to be drawn from the

5

1   facts must be viewed in the light most favorable to the party opposing the motion.  <u>Masson v. New</u>

2   <u>Yorker Magazine</u>, 501 U.S. 496, 520 (1991); <u>Anderson</u>, 477 U.S. at 249.

3        The moving party may "move with or without supporting affidavits for a summary judgment

4   in the party's favor upon all or any part thereof."  Fed. R. Civ. P. 56(a).  "Supporting and opposing

5   affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in

6   evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated

7   therein."  Fed. R. Civ. P. 56(e).

8

9   DISCUSSION

10  I.      <u>Preemption Under Federal Law</u>

11         A.      <u>Section 253(a)</u>

12         NextG argues that the City's permit requirement is preempted on its face by the

13  Telecommunications Act of 1996, which states that "[n]o State or local statute or regulation, or other

14  State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any

15  entity to provide any interstate or intrastate telecommunications service."  47 U.S.C. § 253(a).

16  According to NextG, the City's requirement that a limited facilities-based carrier obtain a wholly

17  discretionary major encroachment permit before installing its facilities in the public rights-of-way

18  may have the effect or preventing the carrier from operating in San Francisco.

19         Under clearly established Ninth Circuit law, section 253(a) effects an extremely broad

20  preemption of state and local regulation of telecommunications services:  "[w]e have interpreted this

21  preemptive language to be clear and 'virtually absolute' in restricting municipalities to a 'very

22  limited and proscribed role in the regulation of telecommunications.'"  <u>Qwest Commc'ns v. City of</u>

23  <u>Berkeley</u>, 433 F.3d 1253, 1256 (9th Cir. 2006) (quoting <u>City of Auburn v. Qwest Corp.</u>, 260 F.3d

24  1160, 1175 (9th Cir. 2001), <u>cert. denied</u>, 534 U.S. 1079 (2002)).  In order to show that a local

25  regulation is preempted, the provider need not show that the local requirement has had an "actual

26  impact" on the provision of services.  <u>Id.</u>  Instead, the provider need only show that the ordinance

27  "*may* have the effect of prohibiting the provision of telecommunications services."  <u>Qwest Corp v.</u>

28

UNITED STATES DISTRICT COURT
For the Northern District of California

1   City of Portland, 385 F.3d 1236, 1241 (9th Cir. 2004), cert. denied, 544 U.S. 1049 (2005) (emphasis

2   in original).

3        In City of Berkeley, the Ninth Circuit considered a local regulation which imposed several

4   obligations on telecommunications providers seeking to construct facilities in the public rights-of-

5   way.  In order to avoid substantial fees, each provider was required to "identify its qualifications to

6   provide telecommunications services and to certify that it is in compliance with state and federal

7   laws." City of Berkeley, 433 F.3d at 1257.  In addition, each provider was required to provide the

8   city with a detailed annual report, including rate information, tariffing information, and customer

9   lists. Id. at 1257–58.  The city was allowed to audit the provider's books at any time.  Id. at 1258.

10  Finally, the city retained substantial (though not unlimited) discretion to refuse to issue an

11  excavation permit, or to deny the right to provide services altogether.  Id.  A provider could be

12  subject to fines and penalties for violation of any of the requirements.  Id.

13       The Ninth Circuit found Berkeley's regulation to be preempted.  The reporting and audit

14  requirements were "patently onerous," and the discretion retained by the city to refuse access to the

15  rights-of-way further added to the risk that the regulation would have the effect of prohibiting a

16  provider from offering its services.  Id.

17       Similarly, in City of Auburn the regulations in question required each telecommunications

18  provider to obtain a franchise, which involved a "lengthy and detailed application form, including

19  maps, corporate policies, documentation of licenses," as well as other "information as may be

20  requested by the City." City of Auburn, 260 F.3d at 1176.  Two of the cities named as defendants in

21  the lawsuit required a public hearing before granting the right to install facilities.  Id.  Also, "[e]ach

22  of the franchise systems authorizes the Cities to consider discretionary factors that have nothing to

23  do with the management or use of the right-of-way."  Id.  Finally, the ordinances in question

24  restricted transfers of ownership of the franchise.  Id.  The Ninth Circuit found that the regulation, in

25  total, had the effect of prohibiting telecommunications companies from providing their services.  Id.

26       The major encroachment permitting process at issue here, though not as onerous as the

27  processes described in City of Berkeley and City of Auburn, is still very involved.  The permit

28

7

application itself requires an explanation of the purpose of the facilities, maps showing the location

of the facilities, pictures of the proposed locations, drawings and specifications for the equipment to

be installed, and contact information for the party requesting the permit.  Declaration of Cynthia N.

Chono in Support of Defendants' Opposition to Plaintiff's Motion for Partial Summary Judgment

("Chono Dec."), Exhs. J–K.  The party requesting the permit must pay an $800 processing fee as

well as $4,000 to cover "the Department's reasonable administrative costs and attorney's [sic] fees."

Id., Exh. K.  The requesting party must also provide notice to all other city agencies entitled to

notice under section 786.2 of the San Francisco Public Works Code:  "the Director of Planning, the

Director of Property, the Chief of the Police Department, the Chief of the Fire Department, the

General Manger of the Municipal Railway, the Art Commission, and . . . the City Engineer."  Id.,

Exh. J.  Each city entity must provide a report to the Director of Public Works.  Id.  After the

Director receives the reports, the Department must conduct a public hearing on the permit.  Id., Exh.

K.  The Department then submits a recommendation to the Board of Supervisors.  Id.  The Board has

plenary power to accept or reject the Department's recommendation.

       Under the terms of this permitting process, following a time-consuming and expensive

application process, the Department and the Board of Supervisors still retain absolute discretion as

to whether any given telecommunications carrier will be able to install its facilities in the public

rights-of-way.  Other courts, including the Ninth Circuit in City of Auburn, have found this sort of

unfettered discretion to be especially problematic.  See City of Auburn, 260 F.3d at 1176 ("the

ultimate cudgel is that each city reserves discretion to grant, deny, or revoke the franchises and the

Cities may revoke the franchise if the terms in the ordinance are not followed, even allowing the

Cities to remove the company's facilities."); id. at 1175–76 ("Any 'process for entry' that imposes

burdensome requirements on telecommunications companies and vests significant discretion in local

government decisionmakers to grant or deny permission to use the public rights-of-way 'may have

the effect of prohibiting' the provision of telecommunications services in violation of the Act."

(quoting Bell Atlantic-Maryland, Inc. v. Prince George's County, 49 F. Supp. 2d 805, 814 (D. Md.

1999), vacated and remanded on other grounds, 212 F.3d 863 (4th Cir. 2000))); see also TCG New

8

1    York, Inc. v. City of White Plains, 305 F.3d 67, 76 (2d Cir. 2002), cert. denied, 538 U.S. 923 (2003)

2    ("In particular, the provision that gives the Common Council the right to reject any application based

3    on any 'public interest factors . . . that are deemed pertinent by the City' amounts to a right to

4    prohibit providing telecommunications services, albeit one that can be waived by the City.").  The

5    court therefore concludes that the City's requirement that NextG obtain a major encroachment

6    permit "may prohibit or have the effect of prohibiting" NextG from providing telecommunications

7    services.

8           The City attempts to distinguish its regulation from those struck down in City of Auburn and

9    City of Berkeley on a number of grounds.  First, the City argues that its regulation is appropriate in

10   light of the diminished rights afforded to limited facilities-based carriers:  "[w]here, as with NextG,

11   the CPUC has granted a telecommunications carrier only limited facilities-based authority, the City

12   will not issue a UCP because the CPUC did not authorize the carrier to engage in any new

13   construction in the public rights-of-way."  Defs.' Brief in Opposition at 8.  According to the City,

14   the UCP process for full facilities-based carriers is very straightforward, and does not violate section

15   253.  Section 253, however, does not depend on determinations by state law agencies such as the

16   CPUC for its application; it applies broadly to any "entity" that "provide[s] any interstate or

17   intrastate telecommunications service."  47 U.S.C. § 253(a).  The City does not dispute that NextG

18   provides wireless telecommunications services.  Moreover, the factual predicate for the City's

19   argument has been completely undermined by the January, 2006 holding of the CPUC, which

20   expressly authorized NextG to install its RF antennas on existing utility poles.  The City seemingly

21   ignores this clear holding in its brief.[2]

22          Second, the City argues that because its major encroachment permit process is a law of

23   general applicability, applying to all utilities, it is permissible.  In support of this argument, the City

24   cites City of Portland:

25          [T]here is no indication that Portland or the other Cities . . . have passed ordinances
            that are specific to the telecommunications process and apply to all
26          telecommunications providers attempting to enter the market.  Therefore, to the
            extent that Qwest challenges these ordinance provisions, it is questionable whether §
27          253 even applies.

28

UNITED STATES DISTRICT COURT
For the Northern District of California

UNITED STATES DISTRICT COURT
For the Northern District of California

385 F.3d at 1242.  All district courts in this circuit considering this passage from <u>City of Portland</u> have either rejected it as *dicta* or otherwise distinguished it.  <u>Pacific Bell Tel. Co. v. California Dept. of Trans.</u>, 365 F. Supp. 2d 1085, 1088 n.2 (N.D. Cal. 2005) (White, J.) ("The State's reliance on [<u>City of Portland</u>] for the proposition that comprehensive governmental policies are exempt from Section 253 is misplaced. The Ninth Circuit's statement to that effect in that case was dicta."); <u>Sprint Telephony PCS, L.P. v. County of San Diego</u>, 377 F. Supp. 2d 886 (S.D. Cal. 2005) ("Although the use permit provisions are not telecommunications specific, they are an integral part of the wireless regulatory framework governing wireless providers. Accordingly, the Court properly included the use permit provisions in its section 253(a) analysis.").

Other courts have rejected the language in <u>City of Portland</u> for good reason.  If a city could circumvent the requirements of section 253(a) simply by enacting regulations that apply to all utilities, then federal law would fail to provide any meaningful special protection to telecommunications providers.  Under the City's proposed construction, it could enact a regulation allowing the City to arbitrarily deny any utility access to public rights-of-way without violating section 253(a).  The City's position cannot be reconciled with the plain language of the statute or the deregulatory purpose which it serves.

Third, the City and NextG dispute whether NextG has actually been prevented from offering its services in San Francisco.  The City contends that because NextG has not attempted to obtain a permit, fact questions exist as to whether it would be able to do so.  As discussed <u>supra</u>, however, the preemption analysis under section 253 focuses on the regulation itself, and not on its application to a particular provider.  The parties' "as applied" arguments are therefore not relevant.

The court therefore concludes that the City's regulation falls within the scope of section 253(a).


B.    Section 253(c) Safe Harbor

The City argues that even if its regulation violates section 253(a), it is saved by section 253(c).  Section 253(c) provides municipalities with some latitude in regulating providers:

10

> [n]othing in this section affects the authority of a State or local government to manage the public rights-of-way or to require fair and reasonable compensation from telecommunications providers, on a competitively neutral and nondiscriminatory basis, for use of public rights-of-way on a nondiscriminatory basis, if the compensation required is publicly disclosed by such government.

47 U.S.C. § 253(c). The right to "manage the public rights-of-way" has been interpreted to encompass "control over the right-of-way itself, not control over companies with facilities in the right-of-way." City of Berkeley, 433 F.3d at 1258. For example, cities are permitted to coordinate construction schedules, determine insurance requirements, establish and enforce building codes, and prevent interference between the various systems using the rights-of-way. Id. (quoting City of Auburn, 260 F.3d at 1177).

The City's argument fails because certain of the requirements for obtaining a permit do not fall under the category of "manage[ment]" of the rights-of-way as contemplated by the statute. In particular, the Department of Public Works and the Board of Supervisors have unfettered discretion to reject a permit application altogether, for whatever reasons they choose. Although certain permitting requirements—the provision of plans and photographs—arguably enable the City to manage the installation of facilities on its rights-of-way, the authority to prohibit NextG from installing its facilities at all is "control over [a company] with facilities in the right of way" rather than "control over the right-of-way itself," and is therefore beyond what is contemplated by the safe harbor. See id.

NextG also argues that section 253(c) only allows the City to manage the public rights-of-way on a "competitively neutral and nondiscriminatory basis." According to NextG, the City's decision to subject limited facilities-based carriers to the major encroachment permit process, while allowing full facilities-based carriers to obtain a UCP, is unfairly discriminatory. The City argues that the phrase "competitively neutral and nondiscriminatory basis" modifies only the right to "require fair and reasonable compensation from telecommunications providers" and does not limit the City's ability to manage its rights-of-way.

11

The Ninth Circuit has not squarely addressed the question raised by the parties. NextG relies on language in <u>City of Berkeley</u> suggesting that the nondiscrimination requirement applies to management as well as fees:

> Section 253 also includes a "safe harbor" clause that allows state and local government "to manage the public rights-of-way or to require fair and reasonable compensation from telecommunications providers" so long as the management and compensation is done on a "competitively neutral and nondiscriminatory basis."

433 F.3d at 1255. Other courts have concluded that the text of the statute suggests the narrower interpretation. <u>Cablevision of Boston, Inc. v. Public Improvement Commission of the City of Boston</u>, 184 F.3d 88, 101 (1st Cir. 1999) ("In context, the emphasized language can only modify the immediately preceding phrase, 'to require fair and reasonable compensation from telecommunications providers.'"); <u>Cox Communications PCS, L.P. v. City of San Marcos</u>, 204 F. Supp. 2d 1260, 1269 n.2 (S.D. Cal. 2002) ("The provision 'for use of public rights-of-way on a nondiscriminatory basis,' clearly only modifies 'requir[ing] fair and reasonable compensation.'"). The <u>Cablevision of Boston</u> court ultimately concluded, however, that a narrow reading of the nondiscrimination clause was difficult to reconcile with the deregulatory purpose of the statute, as "discriminatory or competitively slanted management of the public rights of way could interfere with open competition among telecommunications providers just as easily as discriminatory or competitively slanted compensation schemes." <u>Cablevision of Boston</u>, 184 F.3d at 102.

The court finds that both the statutory text and the statute's purpose favor the broader reading. Although the final two clauses of the statute are awkwardly placed—a fact which the <u>Cablevision of Boston</u> court found to be dispositive—the placement of the comma between the phrases "to manage the public rights-of-way or to require fair and reasonable compensation from telecommunications providers" and "on a competitively neutral and nondiscriminatory basis" rather than between "to manage the public rights-of-way" and "or to require fair and reasonable compensation from telecommunications providers" strongly suggests that both management and fees must be nondiscriminatory. Moreover, the court agree's with the <u>Cablevision of Boston</u> court's conclusion as to the purpose of the statute. The power to "manage," as interpreted by the City,

12

UNITED STATES DISTRICT COURT
For the Northern District of California

1 includes the power to exclude certain service providers altogether.  Exclusion has a greater effect on

2 competition than the assessment of a discriminatory fee.  The City's proposed construction is thus

3 not plausible.

4      Having concluded that the safe harbor requires nondiscriminatory management, the question

5 remains whether the City's distinction between limited and full facilities-based providers is justified.

6 The CPUC's recent ruling ends the inquiry, at least with respect to NextG; NextG has as much

7 authority to install its RF antennas on existing utility poles as a full facilities-based provider

8 because, according to the CPUC, the antennas are not new facilities.  See 2006 Cal. PUC LEXIS 19,

9 at *12–*13.  The distinction between limited and full facilities-based providers does not justify

10 different treatment in this case.

11      The City's major encroachment permit process is therefore not saved by section 253(c).

12

13      C.     Section 253(b) Safe Harbor

14      Finally, the City argues that its regulation is saved by section 253(b).  Section 253(b)

15 provides that

16      [n]othing in this section shall affect the ability of a State to impose, on a
competitively neutral basis and consistent with section 254 of this title, requirements
17      necessary to preserve and advance universal service, protect the public safety and
welfare, ensure the continued quality of telecommunications services, and safeguard
18      the rights of consumers.

19 The City argues that the State of California has delegated its authority to protect the public safety

20 and welfare to municipalities.  See City of San Marcos, 204 F. Supp. 2d at 1268.  Thus, according to

21 the City, its requirement for a major encroachment permit is in effect a state regulation.

22      Without passing on the legal merits of the City's argument, the court finds that the regulation

23 is not saved by section 253(b).  The City has offered no coherent explanation as to which of its

24 permitting requirements furthers the public safety and welfare.  In particular, the court cannot

25 conceive of how the City's retention of complete discretion to deny a permit altogether could fall

26 under section 253(b).  See id. at 1268–69 (finding that only those portions of the regulation

27 necessary to safeguard the public health and welfare were saved under section 253(b)).

28

1    The court therefore finds that the City's regulation is preempted by section 253(a) and is not

2    saved by section 253(b) or section 253(c).

3        The court acknowledges the City's concern that absent regulation, wireless antennas will

4    proliferate without regard for public convenience, the negative views of residents, or aesthetic

5    guidelines.  The City is not foreclosed from regulating wireless carriers through neutral, explicit

6    conditions for access which permit carriers to install their antennas and are limited to what is

7    necessary to promote effective management of the City's rights-of-way.  The current regulatory

8    scheme is too broad in scope, vague in its details, and draconian in its effect to pass muster.

9

10   II.    Preemption Under State Law

11       As the court has concluded that the City's regulation is preempted by section 253, it need not

12   consider whether it is also preempted by California law.

13

14   III.   Claims for Declaratory Relief and a Writ of Mandamus

15       NextG's fourth and fifth claims for relief seek a declaration that NextG is entitled to access

16   the City's rights-of-way for installation of its telecommunications network, as well as an injunction

17   requiring the City to grant NextG that access.  The city does not oppose NextG's fourth and fifth

18   claims, other than disputing the merits of NextG's arguments in favor of access.  As the court has

19   granted NextG's motion with respect to its first claim for relief, NextG's motion with respect to its

20   fourth and fifth claims is also granted.

21

22

23

24

25

26

27

28

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

14

CONCLUSION

For the foregoing reasons, the court hereby GRANTS NextG's motion for summary adjudication with respect to its first, fourth, and fifth claims for relief.  In view of the nature of the relief sought, NextG is instructed to submit a proposed form of judgment with copy to opposing counsel within ten (10) days of this order.


IT IS SO ORDERED.


Dated: June 2, 2006
_____
MARILYN HALL PATEL
District Judge
United States District Court
Northern District of California

**UNITED STATES DISTRICT COURT**
For the Northern District of California

15

**UNITED STATES DISTRICT COURT**
For the Northern District of California

**<u>ENDNOTES</u>**

1.  Unless otherwise noted, background facts are either undisputed or are taken from the declarations accompanying defendants' opposition to plaintiff's motion.

2.  The City's continued insistence that NextG should not be allowed to install its antennas on existing utility poles is not well taken in light of the clear ruling of the CPUC.  In requesting that this action be stayed pending the ruling by the CPUC, the City represented that

> [t]he City will show in this motion that the Court should not decide NextG's claims until the PUC has had opportunity to consider and decide the issues raised in the City's complaint because the PUC has primary jurisdiction over those matters.  Once the issues before the PUC related to the extent of NextG's authority are decided, this Court can rely on that determination to decide whether the City violated federal or state law by denying NextG access to the public rights-of-way.

Defs.' Motion to Dismiss / Stay at 2–3.  Now that the CPUC has ruled against the City on each of the City's arguments, the City vigorously asserts that we should not "rely on that determination" in resolving any of plaintiff's claims.  Although the court rules in favor of NextG on other grounds, the City's argument that this court should rely on the determination of the CPUC—an argument which this court accepted in granting the City's motion to stay—arguably serves as a waiver of the City's right to challenge the CPUC's conclusions with respect to NextG's authority before this court.

16